SQUIER, Appellant, vs. HARNISCHFEGER, Respondent.

*January 14—May 9, 1922.*

*Contracts: Interpretation: Intent of parties: Agreement to sell corporate stock: Options.*

1. In the interpretation of contracts they are to be taken by the four corners and the intent of the parties discovered from a consideration of the entire document.
2. Where an employer contracted with one of his employees to sell to him at a fixed price stock of a corporation which had taken over the business of a partnership of which the employer was a member, such stock to be paid for from dividends earned by the corporation, the agreement providing that "in any event the entire purchase price of said stock shall be paid within ten years," and that if the employee discontinued his

employment with the corporation the agreement, which was designated by the parties an option, was to be void, the agreement is an option merely, not binding the employee to do anything and not enforceable on his part, being without mutuality; and the employee, on terminating his employment, forfeited his right to avail himself of it.

VINJE and JONES, JJ., dissent.

APPEAL from a judgment of the circuit court for Milwaukee county: E. T. FAIRCHILD, Circuit Judge. *Affirmed.*

This is an action in equity to secure the possession of certain shares of corporate stock which it is alleged the defendant unlawfully withholds from plaintiff. The action arose out of the following facts: From 1884 to 1910 Alonzo Pawling and *Henry Harnischfeger,* the defendant, as a copartnership, were engaged in the manufacture of electric cranes in the city of Milwaukee. In 1910 a corporation was organized under the name of Pawling & Harnischfeger Company to succeed the partnership. The business, property, and assets of the partnership were transferred to the corporation and 10,000 shares of stock were issued in payment thereof. Four thousand nine hundred and ninety-nine shares were issued to each of the former partners and one share to the wife of each partner. Shortly thereafter, owing to declining health, Pawling was unable to devote his customary time and attention to the business. The plaintiff, *Squier,* had been in the employ of the partnership since 1892, occupied positions of responsibility, and was esteemed a faithful and valuable employee.

On February 10, 1911, a contract was entered into between Pawling and *Squier* for the purpose of enabling the latter to acquire some of the capital stock of the corporation. By virtue of this contract Pawling assigned to *Squier* 166 shares of the capital stock of the corporation and caused to be issued to *Squier* certificate No. 5 for such 166 shares. It was recited in the contract that *Squier* was to be elected a director of the corporation, and that he should be elected secretary thereof by the directors. *Squier* indorsed and

assigned said certificate in blank and it was deposited with the Wisconsin Trust Company, where, by the terms of the agreement, it was to remain until the dividends declared by the corporation applicable to such certificate of stock should accumulate to the amount of the purchase price, fixed at the sum of $24,900. It was also recited: "but in no event shall this agreement extend beyond the term of twenty years from the date of this agreement." It was further provided that upon payment of the purchase price, either by the application of dividends or in cash, the said shares should become the sole property of said *Samuel H. Squier:* "provided, however, and this agreement is made upon the express condition, that said stock shall not be transferred to or become the property of said *Samuel H. Squier* at any time within the term herein mentioned unless said Alonzo Pawling shall have sold and disposed of at least one half of his holdings of stock in said corporation hereinabove mentioned, and it is expressly agreed and understood that unless the said Alonzo Pawling shall have sold and disposed of at least one half of his holdings of the capital stock of said Pawling & Harnischfeger Company within the period above mentioned, this agreement shall be void and of no effect, except as hereinafter otherwise provided."

An irrevocable proxy was in and by the terms of the contract given to Pawling to vote said stock at any meeting of the stockholders of the corporation until said Pawling should have disposed of at least one half of his holdings in said corporation, and it was stipulated that until the happening of such event (the sale of one half of Pawling's stock) "neither the said *Samuel H. Squier* nor any person succeeding him in interest, his heirs, executors, or administrators, shall have any right in any manner to vote or in anywise sell, hypothecate, or dispose of said certificate of stock or the shares represented thereby." All dividends thereafter declared on said stock were to be paid to said Pawling, who should apply the same to the payment of the

purchase price of said stock.    It was also provided in the contract as follows:

"In the event that at any time before the final consummation of this agreement the said *Samuel H. Squier* shall voluntarily leave the said Pawling & Harnischfeger Company or resign his office as director or officer or discontinue his true and faithful service for and with said corporation, this agreement shall be utterly void and said stock shall revert to and be the sole property of the said Alonzo Pawling.

"In the event that at any time before the final consummation of this agreement the said *Samuel H. Squier* shall become permanently disabled by reason of sickness, or in the event of his death, he, or his heirs, executors, and administrators, shall be repaid by the said Alonzo Pawling any and all amounts which the said Alonzo Pawling may have received in the way of dividends from said corporation on account of said stock or in cash from the said *Samuel H. Squier* and said stock shall thereupon be delivered to the said Alonzo Pawling.

"In the event of the final consummation of this agreement according to its terms and the payment of the purchase price of said stock to the said Alonzo Pawling at a time when he has disposed of at least one half of his holdings of stock in said Pawling & Harnischfeger Company, the said certificate of stock shall be delivered to the said *Samuel H. Squier.*

"It is especially agreed by and between the parties hereto that this agreement shall not be considered a sale of said stock by the said Alonzo Pawling to the said *Samuel H. Squier,* but as an option on the part of said *Samuel H. Squier* to acquire and purchase said stock, and his right of possession and ownership shall not become vested until said Alonzo Pawling has disposed of at least one half of his holdings of stock in the said Pawling & Harnischfeger Company and until the said Alonzo Pawling has been paid the purchase price hereinabove mentioned, either by way of dividends or in cash.    This agreement shall be binding upon the parties hereto, their respective heirs, executors, administrators and assigns."

On the same day Pawling entered into similar contracts with W. H. Hassenplug and F. P. Breck, two other old and

trusted employees of the concern, for stock in different amounts. The total amount of the stock which he thus contracted to dispose of to these three employees aggregated 398 shares.

Thereafter Pawling entered into negotiations with *Harnischfeger* with a view of selling his stock to him. During the course of the negotiations a preliminary memorandum was prepared and signed by both parties. This memorandum recited that

"Mr. Pawling is the owner and in control of $500,000 of the Pawling & Harnischfeger Company, which shares are 5,000 in number at $100 each. This stock is calculated at $150 per share,

| | |
|---|---|
| Which is ............................. | $750,000 |
| Then there is cash ................... | 250,000 |
| Balance .............................. | 500,000 |
| Contracted away ..................... | 60,000 |
| Balance .............................. | 440,000 |
| *Mr. Harnischfeger* agrees to overtake one half of the shares contracted away, which adds .......................... | 30,000 |
| Making a total ...................... | 470,000 |

which is the balance to be paid within ten years, with five per cent. interest payable annually. Interest on deferred interest items at the same rate until paid."

Then followed a memorandum as to the manner of payment and other details of the agreement, providing, among other things, "that an agreement between *Mr. Harnischfeger* and Mr. Pawling shall be drawn up embodying the sale and purchase of the stock above mentioned, binding both parties, and their heirs, executors, administrators, or assigns." Pursuant to this memorandum a written agreement was drawn up between Pawling and *Harnischfeger* under date of June 22, 1911, by which Pawling transferred to *Harnischfeger* 4,801 shares of the capital stock of the Pawling & Harnischfeger Company. No mention is made in this contract concerning the *Squier,* Breck, and Hassenplug stock except this:

"In consideration of the premises the said party of the first part agrees to surrender up for cancellation 5,000 shares of stock now held by him, except 199 shares thereof which is contracted to *Squier,* Hassenplug, and Breck."

It will be noticed that the 199 shares therein mentioned is one half of the number which Pawling had contracted to dispose of to the three employees named.

Thereafter, and on July 10, 1911, the following agreement was made and entered into between *Harnischfeger* and *Squier,* to wit:

"This agreement, made and concluded on this 10th day of July, 1911, by and between *Henry Harnischfeger,* of Milwaukee, Wisconsin, party of the first part, and *Samuel H. Squier,* of the same place, party of the second part:

"Witnesseth, that the said party of the first part does hereby agree to sell to the said party of the second part, his heirs and assigns, eighty-three shares of stock of the capital stock of the corporation known as the Pawling & Harnischfeger Company, of Milwaukee, Wisconsin, which said stock is evidenced by stock certificate of said corporation No. 13 for eighty-three shares. The purchase price for said stock it is agreed is the sum of $12,450. It is agreed that such purchase price shall be paid by the said party of the second part to the said party of the first part by the application of all dividends declared in favor of said stock by the Pawling & Harnischfeger Company annually or at any time when such dividends are declared; such dividends to be paid to the said party of the first part directly by said corporation.

"In any event the entire purchase price for said stock shall be paid within ten years from and after July 1, 1911, and if such dividends declared by the said Pawling & Harnischfeger Company are insufficient to pay the entire purchase price as aforesaid, the balance shall be paid by the said party of the second part to the said party of the first part within the time above limited.

"Said stock certificate has been issued to *Samuel H. Squier* and assigned by him to and is now held by the said party of the first part and shall be delivered up and surrendered to said *Samuel H. Squier* upon the payment of the purchase price herein stipulated."

It thus appears that pursuant to the agreement between the partners each obligated himself to sell to *Squier* eighty-three shares of the capital stock of the company, the sum of the two contracts amounting to the number of shares which Pawling originally agreed to convey to *Squier*.

On the 1st day of November, 1916, *Squier* resigned as director and secretary of the corporation and discontinued his employment therewith. Sometime prior to July, 1917, Pawling died, and on that day his executors sold and transferred to the defendant *Harnischfeger* the eighty-three shares of stock which Pawling had contracted to sell to *Squier;* there having been paid thereon at that time the sum of $7,223.50 by the application of dividends, leaving due upon said purchase price the balance of $5,276.50, the then present worth of which *Harnischfeger* paid to the executors.

On December 20, 1917, *Harnischfeger* served on *Squier* a paper reciting the various transactions concerning this stock heretofore set forth, and that *Squier* refused to carry out and perform said contracts by voluntarily leaving the said Pawling & Harnischfeger Company before the final consummation of said contracts; that he organized an independent and competing corporation, of which he became an officer, and the business of which he managed; and that the consideration for the grant of the privileges mentioned in the contracts had therefore failed. Said paper further recited:

"Now, therefore, I, the undersigned, in my own right and as assignee of the eighty-three shares of stock which you had the privilege of purchasing from Alonzo Pawling and being now the owner of the whole number of 166 shares of stock mentioned in said original agreement of February 10, 1911, and the owner of all causes of action and rights possessed by said Alonzo Pawling in his lifetime and by his executors after his death, do hereby revoke and rescind all of said contracts and agreements and the whole thereof and do declare any and all dividends which might have been

properly applied toward the purchase price of said stock wholly forfeited, of which you will please take notice."

On the 8th day of August, 1918, the summons in this action was served. On May 4, 1920, the plaintiff tendered $3,992.50, the balance due on both of said contracts after the application of the dividends declared on the stock covered by both contracts up to that time. On the 15th day of May, 1920, an amended complaint was served in this action alleging such tender and that by reason thereof plaintiff is entitled' to the stock covered by the two contracts, and praying judgment requiring defendant to deliver to plaintiff the stock mentioned in said contracts, and for such other and further relief as may be proper.

The action was brought on for trial on the 21st day of February, 1921. The court made and filed findings of fact, in which he found the facts heretofore set forth and, in addition thereto, that the plaintiff had full knowledge of Alonzo Pawling's physical condition, of his intention to dispose of his interest in the company, and of the sale of Alonzo Pawling's interest in the corporation to the defendant, and was familiar with the terms of that sale; that the defendant *Harnischfeger* had knowledge of the making of the contracts of February 10, 1911, at the time they were made, and knew the contents and the terms thereof and the conditions upon which the said stock was to become the property of the plaintiff; that subsequent to the memorandum agreement for the sale of Pawling's interest to *Harnischfeger,* and prior to June 27, 1911, plaintiff and defendant had a conversation in which *Harnischfeger* informed the plaintiff that he had taken over half of the stock which Pawling had agreed to sell to the plaintiff, and that he, *Harnischfeger,* would take care of the interest of the plaintiff in the same manner as before; that July 10, 1911, the contracts between Pawling and *Squier* and *Harnischfeger* and *Squier* were entered into, and that nothing was

paid by the plaintiff either to Alonzo Pawling or *Henry Harnischfeger* for the contracts of July 10, 1911.

The court ruled that the contracts of July 10, 1911, were void for want of mutuality, and that it appeared upon the face thereof that they did not express the entire agreement between the parties, and accordingly received in evidence the contract between Pawling and *Squier* of February 10, 1911, as well as evidence of the sale by Pawling of his interest in the company to *Harnischfeger,* and parol evidence as to plaintiff's knowledge of such transaction and conversations between *Harnischfeger* and *Squier* prior to the contract of July 10, 1911.

As conclusions of law the court found that, by resigning as director and secretary and quitting the employment of the company, the plaintiff breached the contract under which he claims his right to the stock in question, forfeited his right thereto, denied the relief prayed for, and entered judgment in favor of the defendant. From the judgment so entered plaintiff brings this appeal.

*W. A. Hayes,* attorney, and *N. L. Baker,* of counsel, both of Milwaukee, for the appellant.

For the respondent there was a brief by *Roehr & Steinmetz,* attorneys, and *Julius E. Roehr,* of counsel, all of Milwaukee, and oral argument by *Julius E. Roehr.*

The following opinion was filed February 7, 1922:

OWEN, J.   Plaintiff's cause of action is founded upon the contracts between himself and Pawling and himself and *Harnischfeger* under date of July 10, 1911, by which Pawling and *Harnischfeger* severally agreed to sell to the plaintiff eighty-three shares of the capital stock of the Pawling & Harnischfeger Company for the sum of $12,450, the purchase price of which was to be paid by the application of all dividends declared in favor of said stock by the company. These contracts are set forth in the statement of facts, and

more extended reference will not be made to them at this time.

The trial court, upon the contention of the respondent, held that these contracts were void for want of mutuality; that upon their face they appear to be gratuities from *Harnischfeger* and Pawling to the plaintiff; that they did not obligate the plaintiff to do anything; and that if there was any consideration to support them it must be found in evidence *dehors* the contracts. Evidence offered by respondent was therefore admitted to show the prior dealings between the parties relating to this stock, which evidence included the contract of February 10, 1911, between Pawling and the appellant. The judgment is assailed here principally upon the alleged error committed by the court in so construing the contracts and in the reception of such extrinsic evidence.

We are therefore immediately confronted with the proper construction of the contract of July 10th. It provides "that the said party of the first part does hereby agree to sell to the said party of the second part" eighty-three shares of the capital stock of the Pawling & Harnischfeger Company. "The purchase price for said stock it is agreed is the sum of $12,450. It is agreed that such purchase price shall be paid by the said party of the second part to the said party of the first part by the application of all dividends declared in favor of said stock by the Pawling & Harnischfeger Company annually or at any time when such dividends are declared; such dividends to be paid to the said party of the first part directly by said corporation." This certainly looks like a generous contract. It is an arrangement by which the party of the first part agrees to sell certain shares of stock to the party of the second part, such stock to be paid for out of dividends accruing thereto. It amounts to an agreement to give to the party of the second part the shares of stock therein mentioned when the dividends accruing thereon shall amount to the purchase price therein fixed. The contract

·does not provide that any interest on the purchase price shall be charged or paid. Thus far the contract has every earmark of a mere gratuity.

But attention is called to the fact that the contract further provides that "in any event the entire purchase price for said stock shall be paid within ten years from and after July 1, 1911, and if such dividends declared by said Pawling & Harnischfeger Company are insufficient to pay the entire purchase price, as aforesaid, the balance shall be paid by the said party of the second part within the time above limited." Appellant contends that this obligates the party of the second part to pay the purchase price stipulated in the contract within ten years from the date thereof whether or not any dividend be declared, thus furnishing an adequate consideration for the contract. Respondent contends that this provision merely amounts to an option to be exercised by the party of the second part at his discretion, and means that if the dividends do not amount to the full purchase price within ten years, and the party of the second part desires the stock, he must at that time pay the difference between the accrued ·dividends and the purchase price; otherwise the stock is forfeited. The pertinent language is: "in any event the entire purchase price for the stock shall be paid within ten years." Plainly this fixes the duration of the contract. But does it amount to the assumption of any responsibility on the part of the party of the second part? Perhaps under some circumstances it would be so construed. But language is always to be construed with reference to the context, and in the interpretation of contracts they are to be taken by the four corners, and the intent of the parties discovered from a consideration of the entire document. The language is not inapt to constitute the option privilege for which respondent contends. It does not comport with the language employed to bind the party of the first part. It will be observed that the contract starts out by stating "the said party of the first part does hereby agree." There is no

doubt concerning the meaning of that language. It is significant that the contract contains no similar language binding the party of the second part. From beginning to end there is no language whereby the party of the second part expressly agrees to do anything. It cannot be said that the language, "in any event the entire purchase price of the stock shall be paid within ten years," is consistent only with an obligation on the part of the party of the second part to make such payment. As already stated, it is appropriate language to express the idea that the duration of the contract is ten years; that the opportunity of the party of the second part to acquire the stock in the manner specified expires in ten years, at which time he must pay the difference in cash if he wants the stock.

A generous spirit pervades the contract. It seems to have been the purpose of the party of the first part to extend to the party of the second part an easy opportunity to acquire stock in the corporation. It is said that this is not necessarily true, and for all that appears the contract might have been a beneficial one to the owner of the stock, in that he secured a substantial price for the stock in ten years. It is readily appreciated that such a contract would be an advantageous one for the owner of worthless stock—so advantageous in fact that no one with the slightest business sagacity would become a party of the second part thereto. But such chimerical hypothesis affords neither a safe nor reasonable test in ascertaining the intention of the parties to this contract. There is ample evidence that the stock dealt with had substantial value. It is indicated by the price stipulated, by the mutual assumption that it would pay dividends, and by the allegations of the complaint that the dividends accruing thereto in nine years were more than eighty per cent. of the stipulated purchase price. We cannot avoid the conviction that the contract was a beneficent rather than a harsh bargain, and that it was the intention and purpose of the party of the first part to deal generously with the party of

the second part, and to provide an easy way for him to acquire an interest in the corporation, and that the opportunity was in the nature of an option of which the party of the second part was required to avail himself within the ten-year period. We agree with the lucid observation of the learned trial judge, made during the course of the trial, when he said:

"I have read this contract through several times, and you cannot escape—at least I cannot—the conclusion as you finish it, that either it is lacking in mutuality—either the contract existing between them is lacking in mutuality, or else this isn't the whole of the contract. It might be analyzed in a number of ways, but, on the face of it, it seems that $12,500 worth of property is being turned over to *Mr. Squier,* he does not have to pay for it for ten years, no interest to be charged against him in any event, and if the dividend in the meantime amounts to the sum of $12,500 he has that property. Now it in itself suggests that we must look somewhere else for the rest of the bargain."

This results in the conclusion that the contract is void and unenforceable for the reason that it lacks mutuality and is in the nature of a mere gratuity. The respondent might well have rested his case upon this proposition, but he chose to offer evidence showing the entire transaction and the relation between the parties, which was received by the court. While this was objected to on the part of appellant, in view of our construction of the contract of July 10th the reception of that evidence was not prejudicial to him. The respondent offered evidence which constituted appellant's only resort to establish a valid contract. This included the contract between Pawling and *Squier* under date of February 10, 1911. We need refer to but two items of that contract to conclusively indicate the intention of the parties in the respect we have been discussing. Item 9 thereof provides that if the appellant voluntarily discontinues his service with the corporation, then the agreement is to be utterly void, and item 11 provides that the agreement shall not be con-

Squier v. Harnischfeger, 177 Wis. 89.

sidered a sale of said stock, "but as an option on the part of said *Samuel H. Squier* to acquire and purchase said stock."

When Pawling negotiated with *Harnischfeger* for the sale of his interest in the corporation to the latter, it was agreed between the two partners that the burden of this contract, and those of a similar nature with the other two employees, should be borne equally by Pawling and *Harnischfeger*. It seems that *Harnischfeger* knew of the contract of February 10th when it was made, and that *Squier* knew of the negotiations between Pawling and *Harnischfeger*. It is unnecessary for us to discuss at length all of the extrinsic evidence received in the case to indicate the purpose and intention of the parties in the contracts of July 10th. The conclusion of the court to the effect that the rights of the parties are referable to the contract of February 10, 1911, finds most satisfactory support, if indeed it is not conclusively established, by such evidence.

It follows that the contracts of July 10th were not contracts of absolute sale, but that they partook of the option character of the contract of February 10th, and that for the appellant to enjoy the benefits arising from that contract it was necessary for him to remain in the employ of the corporation during the term thereof. It being a conceded fact in the case that he voluntarily quit the service of the company November 1, 1916, long before the purchase price of the stock had been paid in the way of accumulated dividends or otherwise, the contract was terminated and his rights thereunder ceased. Thereafter he was not entitled to have the accrued dividends applied on the purchase price, nor was it his privilege or right after that time to tender the balance of the purchase price and demand delivery of the stock.

*By the Court.*—Judgment affirmed.

The following opinion was filed February 11, 1922:

VINJE, J. (*dissenting*). I am unable to concur in the conclusion that under the contract of July 10, 1911, the

Squier v. Harnischfeger, 177 Wis. 89.

plaintiff did not bind himself to purchase the stock on or before ten years from July 1, 1911, and in the conclusion that it is an option, and is incomplete as a contract. The contract clearly designates the seller and the buyer, and it is signed by both parties. An option is not so signed. It is signed only by the party giving it. The contract says that the purchase price shall be paid by the purchaser to the seller and provides how it shall be paid, the amount of payments, and the time within which it shall be paid. Just how the contract could be made more definite and certain in those respects it puzzles me to understand. That the owner of an industry may give a valued employee a generous contract is not strange. Whether the contract in question would turn out to be generous would depend upon the prosperity of the business or the future value of the stock. Should that fall below par before the expiration of the contract, it might turn out to be very generous to the seller instead of to the buyer.

Jones, J. I concur in the foregoing dissenting opinion of Mr. Justice Vinje.

Crownhart, J., took no part.

A motion for a rehearing was denied, with $25 costs, on May 9, 1922.